IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| STACY G. D., § | | |
| § | | |
| Plaintiff, § | | |
| § | | |
| v. § | Civil Action No. 3:18-CV-0204-BH | |
| § | | |
| NANCY A. BERRYHILL, ACTING § | | |
| COMMISSIONER OF THE SOCIAL § | | |
| SECURITY ADMINISTRATION, § | | |
| § | | |
| Defendant. § | Consent | |

**MEMORANDUM OPINION AND ORDER**

By consent of the parties and the order of transfer dated December 28, 2017 (doc. 16), this case has been transferred for the conduct of all further proceedings and the entry of judgment. Based on the relevant filings, evidence, and applicable law, the Commissioner's decision is **REVERSED**, and the case is **REMANDED** for further administrative proceedings.

**I. BACKGROUND**

Stacy G. D. (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying his claim for disability insurance benefits (DIB) under Title II of the Social Security Act (Act). (*See* docs. 1; 17.)

**A.  Procedural History**

On October 21, 2015, Plaintiff filed his application for DIB, alleging disability beginning on March 22, 2014. (doc. 12-1 at 104, 186.)[1] His claim was denied on July 6, 2016, and upon reconsideration on October 17, 2016. (*Id*. at 126, 133.) On November 16, 2016, he requested a

---

[1] Citations to the record refer to the CM/ECF system page number at the top of each page rather than the page numbers at the bottom of each filing.

hearing before an Administrative Law Judge (ALJ). (*Id*. at 136.) He appeared and testified at a hearing on May 17, 2017. (*Id*. at 48-88.) On June 22, 2017, the ALJ issued a decision finding that he was not disabled and denying his claim for benefits. (*Id*. at 30-41.)

Plaintiff timely appealed the ALJ's decision to the Appeals Council on August 11, 2017. (*Id*. at 21, 184.) The Appeals Council denied his request for review on September 28, 2017, making the ALJ's decision the final decision of the Commissioner. (*Id*. at 9.) Plaintiff timely appealed the Commissioner's decision under 42 U.S.C. § 405(g). (*See* doc. 1.)

**B.     Factual History**

    **1.     Age, Education, and Work Experience**

Plaintiff was born on July 9, 1963, and was 53 years old at the time of the hearing. (doc. 12-1 at 53-56.) He had a high school education, as well as a Master's degree in aviation safety. (*Id*. at 39, 54.) He had past work experience as a Captain in the United States Air Force. (*Id*.)

    **2.     Medical Evidence**

On January 27, 2014, Plaintiff was provided a letter with a summary of his benefits from the Department of Veterans Affairs (VA). (doc. 12-2 at 302.) It showed that he was considered to be totally and permanently disabled due to his service-connected disabilities, and he was awarded a combined 100% service-connected disability rating. (*Id*.)

On April 14, 2014, Plaintiff presented to Grand Prairie Urgent Care (GPUC) complaining of knee and back pain. (doc. 12-1 at 505, 508.) A physical examination showed that he was rotund due to obesity, had lower back pain, had moderate bilateral lumbar tender points with increased pain upon forward flexion, and had bilateral knee stiffness with an inability to fully flex his left knee and increased pain bilaterally when weight bearing. (*Id*. at 509.) He was diagnosed with worsening low back pain, worsening joint pain in his knee, and obesity. (*Id*.)

On April 30, 2014, Plaintiff returned to GPUC complaining that he had passed a kidney stone the previous morning and requesting refills on his medications. (*Id*. at 498, 501.) Following an examination, he was diagnosed with coronary artery disease, asthma, type II diabetes mellitus, benign hypertension, low testosterone, and back pain. (*Id*. at 502.)

On December 30, 2014, Plaintiff went to GPUC to discuss his previous lab results, and he complained that he had experienced mid-lower back pain for about 4 days. (*Id*. at 296, 298.) Upon physical examination, Plaintiff was found to have tender mid and lower back pain with no vertical point tenderness. (*Id*. at 299.) He moved all extremities well with no decreased range of motion, and no defect, deformity, or edema was appreciated. (*Id*.) He was in good spirits and had normal affect. (*Id*.) He was diagnosed with thoracic back pain and lower back pain. (*Id*.)

On January 21, 2015, Plaintiff saw Ray Shoulders, PA-C, for lower back pain and shoulder pain. (*Id*. at 417.) His lower back pain was moderate and he rated it at a 3-6 on a 10-point scale, with the pain being at an 8 on his worst days and a 3 on his best days. (*Id*.) His pain was aggravated by bending, bending forward, movement, repeated activity, rest, sitting, standing, and walking, and it was mitigated by heat and medication. (*Id.*) He denied any additional symptoms. (*Id*.) It was noted that Plaintiff had been in multiple car accidents, which were the cause of his back pain. (*Id*.) In his physical examination, he demonstrated tenderness and trigger points to inspection/palpitation in his cervical spine with no subluxations; moderately reduced range of motion in flexion, right side extension, and left side rotation; cervical paraspinal spasms; moderately increased paraspinal muscle tone; a negative Spurling's test; a positive axial traction test; a negative shoulder abduction test; and a negative Hoffman's test. (*Id*. at 419.) In his lumbosacral spine, Plaintiff had trigger point tenderness, no subluxations, moderately reduced flexion, right side extension, left side rotation, paraspinal muscle spasms, moderately increased paraspinal muscle tone, a positive straight leg raise

3

test, a negative Faber's test bilaterally, positive facet loading, and no Waddell signs or Sacral Sulcus signs. (*Id*.) Plaintiff was diagnosed with chronic pain syndrome, lumbosacral radiculitis, cervicalgia, cervical radiculitis, and lumbago. (*Id*. at 420.)

On February 19, 2015, Plaintiff returned to GPUC to discuss his hypertension and refill his medication. (*Id*. at 287, 289.) He was rotund due to obesity, but had normal breath sounds, and no wheezes, rhonchi, or rales. (*Id*. at 290.) His musculoskeletal system was normal, and he moved all extremities well with no decreased range of motion. (*Id*.) His diagnoses included joint pain in his knee, coronary artery disease, and type II diabetes mellitus without complications. (*Id*.)

On May 21, 2015, Plaintiff saw Luis Nieves, M.D., for a follow-up for his lower back pain. (*Id*. at 427.) His pain was at a 4 out of 10 on his medication regiment. (*Id*.) His medications allowed him to perform his normal daily activities, and he reported that his lower back pain was stable or fluctuated with activity. (*Id*.) He continued to describe his pain as dull, stabbing, pinching, and sharp. (*Id*.) He underwent multiple injections of Toradol in his spine. (*Id*. at 431.)

On June 25, 2015, Plaintiff saw Mr. Shoulders for a follow-up for his back pain. (*Id*. at 432.) He reported feeling about the same since his prior visit. (*Id*.) He again reported that his medications allowed him to perform his normal daily activities. (*Id*.) He was assessed with chronic pain syndrome, lumbosacral radiculitis, cervicalgia, cervical radiculitis, and lumbago. (*Id*. at 435-36.)

On August 31, 2015, Plaintiff saw Dr. Nieves again for another follow-up for his lower back pain. (*Id*. at 437.) He rated his pain at a 7 out of 10 and reported pain in his left shoulder that caused him to stay up during the night. (*Id*.) He also reported that his lower back pain fluctuated with activities, but he was able to perform his normal activities with his medication. (*Id*.)

On November 2, 2015 and December 29, 2015, Plaintiff met with Mr. Shoulders for follow-up appointments. (*Id*. at 442, 452.) In November, he complained that his lower back pain was at

an 8 out of 10. (*Id*. at 442.) He denied any new pain or symptoms but reported increased pain, and he needed a refill of his medications. (*Id*.) In December, he rated his pain at a 3 out of 10. (*Id*. at 452.) At both appointments, he reported that his medications gave him moderate pain relief without any side effects, and they allowed him to perform his normal activities. (*Id*. at 442, 452.) He continued to describe a stabbing pain that occurred with range of motion activities. (*Id*.)

On January 26, 2016, February 9, 2016, and April 5, 2016, Plaintiff was seen by Dr. Nieves for follow-up visits. (*Id*. at 457, 462, 472.) In January, his pain was at a 4 out of 10 with medication and a 7 out of 10 without. (*Id*. at 457.) In February and April, he reported that his pain level was at a 4 out of 10 with medication and an 8 out of 10 without. (*Id*. at 462, 472.) Throughout his appointments, he continued to report that he could perform his normal daily activities while on medication. (*Id*. at 457, 462, 472.)

On May 27, 2016, Plaintiff presented to the Methodist Health System with blood pressure and chest pressure issues. (*Id*. at 200, 202.) An ECG test revealed non-specific lateral T-wave changes and normal ejection fraction, and his cardiac enzymes were minimally elevated. (*Id*. at 202.) A left heart catheterization showed no significant occlusion. (*Id*.) He was discharged on June 1, 2016, with stabilized blood pressure. (*Id*. at 203.)

On June 3, 2016, Sudhakar Rumalla, M.D., performed a consultative physical examination of Plaintiff. (*Id*. at 351.) Plaintiff complained of lower and upper back pain that was aggravated by routine activities. (*Id*.) He reported that both of his knee joints were aggravated by walking and standing, he avoided stairs, and on a good day, he could maybe walk 100 yards with or without a cane. (*Id*. at 352.) He estimated that he could stand for 10-15 minutes, sit for 30 minutes, and carry about 10 pounds 75 feet. (*Id*.) His physical examination was significant for morbid obesity, tenderness in his thoracic lumbar spine, tenderness in both knee joints, mildly diminished breathing

sounds in both lung fields, impaired tactile pinprick sensation in both feet, distal legs, absent deep tendon reflexes, and tenderness in his right shoulder. (*Id*. at 354.) Dr. Rumalla's impressions included chronic lumbosacral syndrome, lumbar spondylosis, degenerative disc disease, facet arthropathy, chronic thoracic syndrome, thoracic spondylosis, chronic pain in both knees, type II diabetes mellitus, diabetic peripheral polyneuropathy, sleep apnea syndrome, morbid obesity, and severe uncontrolled hypertension. (*Id*.)

On June 13, 2016, Earl T. Patterson, Ph.D., completed a psychological report for Plaintiff. (*Id*. at 357.) Plaintiff complained of anxiety with panic attacks and depression. (*Id*.) He used a cane to steady his gait, his posture was erect, and his fine motor control appeared to be good. (*Id*.) He reported that his anxiety and depression had increased over the prior year. (*Id*. at 358.) Following a mental status examination, Dr. Patterson diagnosed him with severe major depressive disorder and panic disorder. (*Id*. at 359.) His prognosis was guarded. (*Id*.)

On June 28, 2016, Andrea Fritz, M.D., a state agency medical consultant (SAMC), completed a physical residual functional capacity (RFC) evaluation for Plaintiff based on the medical evidence of record. (*Id*. at 97-99.) Dr. Fritz opined that he could lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for about 6 hours in an 8-hour workday; sit with normal breaks for about 6 hours in an 8–hour workday; push or pull, including operation of hand and/or foot controls, without limitations other than those stated for lifting and carrying; occasionally climb ramps, stairs, ladders, ropes, and scaffolds; occasionally stoop, kneel, crouch, and crawl; and frequently balance. (*Id*. at 98.) She further found that Plaintiff had limitations in reaching overhead with his right arm, but no limitations in handling, fingering, or feeling. (*Id*. at 98-99.) He had no visual limitations, communicative limitations, or environmental limitations. (*Id*. at 99.) On October 12, 2016, Nancy Childs, M.D., a SAMC, also completed a physical RFC

evaluation for Plaintiff, and her opinions were identical to Dr. Fritz's. (*See id*. at 115-17.)

On July 1, 2016, Mark Schade, Ph.D., a state agency psychological consultant (SAPC), completed a mental RFC evaluation for Plaintiff based on the evidence of record. (*Id*. at 99-101.) He found that Plaintiff was moderately limited in his abilities to understand and remember detailed instructions; carry out detailed instructions; interact appropriately with the general public; ask simple questions or request assistance; and accept instructions and respond appropriately to criticism from supervisors. (*Id*. at 100-101.) Plaintiff was not significantly limited in the remaining areas of understanding and memory, concentration and persistence, and social interaction, and that he had no adaptation limitations. (*Id*.) On October 12, 2016, Joel Forgus, Ph.D., a SAPC, also completed a mental RFC evaluation for Plaintiff, and his findings were identical to Dr. Schade's, except that he opined that Plaintiff was also moderately limited in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (*Id*. at 117-19.)

On August 19, 2016, Arash Manzori, D.O., examined Plaintiff for hypertension and congestive heart failure. (doc. 12-2 at 730.) He had no complaints of chest pain, and Dr. Manzori rated his heart impairment at NYHA Class II, which denoted slight limitations of physical activity and comfortable at rest. (*Id*. at 732.) He found that Plaintiff had mild exertional limitations. (*Id*.)

On September 11, 2016, Anurada Tavarekere, M.D., performed a consultative physical examination for Plaintiff. (*Id*. at 290-93.) Plaintiff's chief complaints included heart problems, back pain, bilateral leg pain, right shoulder pain, and headaches. (*Id*. at 290.) He had a normal gait, could walk unassisted, could stand on his heels and toes, could not bend and get back up without difficulty, could not squat and get back up without difficulty, and he had difficulty getting on and off of the examination table. (*Id*. at 292.) His straight leg raise test was negative. (*Id*.) He also had

7

tenderness in his shoulder and limited range of motion in his right upper extremity. (*Id*.) His lungs were clear to auscultation and percussion with normal breath sounds and without wheezes, ronchi, or crackles. (*Id*.) Dr. Tavarekere's impressions included coronary artery disease status post myocardial infarction, lumbosacral degenerative disc disease and spondylosis, bilateral knee osteoarthritis, bilateral shoulder osteoarthritis, headaches, obesity, type II diabetes mellitus, hypertension, sleep apnea, and diabetic neuropathy. (*Id*. at 293.)

### 3. Hearing Testimony

On January 21, 2016, Plaintiff and a vocational expert (VE) testified at a hearing before the ALJ. (*Id*. at 48-88.) Plaintiff was represented by a non-attorney representative. (*Id*. at 48, 50.)

#### a. *Plaintiff's Testimony*

Plaintiff testified that he was born on July 9, 1963, and was 53 years old. (*Id*. at 55-56.) He was divorced and lived in a house with his oldest son. (*Id*.) He lived on his retirement income from the United States Air Force and had a VA disability rating of 100%. (*Id*. at 56-57.) He was 5'10" and weighed 270 pounds. (*Id*. at 57.) He had broken his leg in March and was using a cane at the hearing. (*Id*.) He did not drive if he did not have to, but he had driven a limited amount during 2016. (*Id*.) He used to ride a motorcycle, but he had not ridden one since June 2016. (*Id*. at 59.)

Plaintiff was in the Air Force and ran the officer selection boards for Air Force line officers at the Air Force Recruiting Service. (*Id*. at 60.) Shortly before he retired in October 2010, he worked as an operations commander. (*Id*.) When he was working in the recruiting headquarters, he prepared applications from Air Force applicants to become officers, categorized them, and had his staff prepare the individuals. (*Id*. at 61.) While working, he did not spend much time at his desk because he had meetings with the personnel center and the commander, and he spent a lot of time solving issues. (*Id*. at 62.) When he was an operations commander, he drove all over Texas and

visited Louisiana to different office locations. (*Id*. at 62-63.) As an active duty member, he was required to maintain physical fitness standards, and he would go for runs in the morning and stay active. (*Id*. at 63.)

Plaintiff retired in 2010 because he was physically unable to perform his job anymore. (*Id*. at 64.) He had problems with his back and knees, and he had a dislocated shoulder or torn rotator cuff. (*Id*. at 65-66.) He also had severe sleep apnea, which made working very difficult because he had a hard time sleeping. (*Id*. at 66.) He had started using a "bipap" machine 4 years prior to the hearing and it helped him sleep a little. (*Id*. at 66-67.) On average, he slept well for about 4-5 hours per night, and he would fall asleep about 5-6 times a day. (*Id*. at 67.) His back pain had become worse over the past 3-4 years, and although he received injections that helped with the pain for about a week, he had to stop getting them because his blood pressure was too high. (*Id*. at 67-68.) He had knee problems but did not receive much treatment. (*Id*. at 69.) He also had problems with his right shoulder such that he could not really lift his right arm up above his shoulder and he could not lift things. (*Id*.) He had suffered two strokes in February 2017, which caused him to lose the use of his right side, but he had started to regain it, and he did not have problems writing prior to his strokes. (*Id*. at 69-70.) He also had treatment for asthma and used a steroid inhaler as well as a rescue inhaler when necessary, which controlled his symptoms. (*Id*. at 71.) Regarding his diabetes, he had neuropathy in his feet that was becoming worse, and he had stopped taking some of his medication for diabetes due to side effects. (*Id*. at 72.) He had also been taking medication for his high blood pressure, but it did not control his symptoms well. (*Id*. at 73.)

Over the past few years, Plaintiff consistently felt that he could sit for about 20 minutes before needing to walk around or lay down, and stand or walk for about 50 yards before feeling pain. (*Id*. at 74.) He also spent most of his days on the couch in a reclining position. (*Id*. at 74-75.) He

9

did not do many household chores, but he did do laundry when he needed to, and he was able to grocery shop if he had his injections, although he usually sent his kids. (*Id*. at 75.) He could not lift a gallon of milk with his right hand, and estimated that he could lift about 10-15 pounds with his left hand. (*Id*. at 80.) He also had issues with a short temper and getting along with authority figures, which began when he started losing sleep. (*Id*. at 75-76.) He took Clorazepam to help him deal with being in public, and estimated that he had taken it about 2-3 times per month in the prior year. (*Id*. at 76-77.) That medication was prescribed by his primary care doctor, not a psychiatrist. (*Id*. at 77.) He had received his injections for pain relief from Mr. Shoulders. (*Id*. at 78.)

        *b.*      *VE's testimony*

The VE characterized Plaintiff's past work as a Captain in the United States Air Force, DOT 375.167-034 (light, SVP 8); he had worked in a couple of different positions that were basically management positions. (*Id*. at 81.) When Plaintiff worked in a supervisory position, his position would have been characterized as a management/personnel supervisor and manager, DOT 169.167-034 (sedentary, SVP 7). (*Id*.) Plaintiff acquired supervisory skills, recruiting skills, record keeping skills, and computer skills in his past work. (*Id*. at 82.)

The VE considered a hypothetical individual with the same age, education, and work history as Plaintiff who could lift and carry up to 20 pounds occasionally using his left arm and hand primarily with only support from the right; lift and carry no more than 10 pounds occasionally with his right arm and hand; lift 10 pounds frequently primarily with the left and with support of the right; stand and walk for 2 hours; sit for 6 hours; never perform overhead reaching with the right arm, which was the dominant arm; understand, remember, and carry out detailed but not complex instructions as demanded in jobs rated by the DOT at a reasoning development level 3; and interact with supervisors and the general public occasionally during a workday. (*Id*.) That individual could

not perform Plaintiff's past work for non-exertional reasons because both jobs were highly skilled and required the ability to follow complex instructions. (*Id*. at 82-83.) This individual could perform other work as a record keeping clerk, DOT 249.367-010 (sedentary, SVP 3), with about 8,700 jobs in the region and about 87,000 jobs nationally; information clerk, DOT 237.367-022 (sedentary, SVP 4), with about 20,500 jobs in the region and over 205,000 jobs nationally; and data entry clerk, DOT 203.582-054 (sedentary, SVP 4), with about 100-2,000 jobs in the region and over 1,000,000 nationally. (*Id*. at 83.) Each of these other jobs had a reasoning level of 3. (*Id*. at 84.)

For the job of record keeping clerk, Plaintiff's record keeping skills that were acquired in his past work could have been utilized. (*Id*.) For the job of information clerk, Plaintiff's supervisory experience and computer skills that were acquired in his past work could have been utilized. (*Id*.) For the job of data entry clerk, Plaintiff's computer skills that were acquired in his past work could have been utilized. (*Id*. at 84-85.) All three of these jobs were performed in a clean and climate controlled environment. (*Id*. at 85.) The DOT did not distinguish between reaching overhead with one arm versus the other in describing the demands of occupations, nor did it quantify the interaction with supervisors and the public. (*Id*.) The VE relied on his 30 years of experience in placing individuals in jobs, talking with front line supervisors, and talking with employees about what was required and how the jobs were actually performed. (*Id*.) His testimony did not conflict with the DOT. (*Id*.)

For the clerical jobs, it would not be uncommon to be able to take a 5 minute break during an hour, but an individual would generally have to stay on task for at least 55 minutes out of the hour, and then most of those jobs would have a short mid-morning break. (*Id*. at 86.) There would also be a lunch break that could be 30 minutes or an hour, and a short afternoon break as well. (*Id*.) The mid-morning and afternoon breaks would generally be about 10-15 minutes. (*Id*.) Most

employers would not tolerate an individual needing to take longer or more frequent breaks if it were an ongoing requirement because of the amount of work that would need to get done. (*Id*. at 86-87.) Also, if an individual consistently missed more than 2 days per month of work with regularity, it would lead to termination. (*Id*. at 87.)

C.  **ALJ's Findings**

The ALJ issued her decision denying benefits on June 22, 2017. (*Id*. at 30-41.) At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since March 22, 2014, the application date. (*Id*. at 32.) At step two, the ALJ found that Plaintiff had the following severe impairments: coronary artery disease, status post myocardial infarction, lumbosacral degenerative disc disease and spondylosis, bilateral knee osteoarthritis, bilateral shoulder osteoarthritis, sleep apnea, diabetic neuropathy, obesity, major depressive disorder, and panic disorder. (*Id*.) Despite those impairments, at step three, the ALJ found that Plaintiff had no impairments or combination of impairments that met or equaled the severity of one of the impairments listed in the social security regulations. (*Id*. at 33.)

Next, the ALJ determined that Plaintiff retained the RFC to perform light work as defined in 20 C.F.R. § 404.1567, except that he could stand/walk for only 2 hours during an 8-hour workday; lift/carry up to 20 pounds occasionally with his left arm only; lift/carry no more than 10 pounds occasionally with his right arm/hand; never reach overhead with his right arm/hand; understand, remember, and carry out detailed instructions as demanded in jobs rated by the *Dictionary of Occupational Titles* (DOT) as reasoning development level 3; and interact with supervisors and the public occasionally during the workday. (*Id*. at 34.) He further determined that Plaintiff must work in a clean, climate-controlled environment. (*Id*.)

At step four, the ALJ determined that Plaintiff had past relevant work experience as a

squadron commander/supervisor while he was a Captain in the United States Air Force. (*Id*. at 39.) The ALJ found that Plaintiff acquired record keeping skills, supervisory skills, communication skills, and computer skills in his past work. (*Id*.) At step five, the ALJ found that considering his age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that he could perform. (*Id*. at 39-40.) Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined by the Social Security Act, from March 22, 2014, the alleged onset date, through December 31, 2016. (*Id*. at 40.)

## II. ANALYSIS

### A. **Legal Standards**

#### 1. **Standard of Review**

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program

is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). The relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are also identical to those governing the determination under a claim for supplemental security income. *See id.* Courts may therefore rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id.*

2. **Disability Determination**

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual

>     functional capacity must be considered to determine if work can be
>     performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)). Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id*. Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### B.  Issues for Review

Plaintiff presents one issue for review:

> The Social Security Administration must always explain why another governmental agency's conclusion of disability is found unpersuasive. In this case, [Plaintiff] submitted a 100% disability rating from the Department of Veterans Affairs, which the ALJ declined to adopt because the decision was "based on its rules and is not binding on the Commissioner of Social Security." Was the ALJ's analysis of the VA determination legally sufficient, and if not, did the oversight adversely affect [Plaintiff's] substantial rights?

(doc. 17 at 5.)

### C.  VA Disability Determination

Plaintiff argues that "[t]he ALJ failed to provide a legally sufficient explanation for why she found [Plaintiff's] 100% disability rating from [VA] not persuasive." (*Id*. at 13.)

"A VA rating of total and permanent disability is not legally binding on the Commissioner because the criteria applied by the two agencies is different, but it is evidence that is entitled to a certain amount of weight and must be considered by the ALJ." *Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001) (citations omitted); *see also* SSR 06–03p, 2006 WL 2329939 at *6 (S.S.A. Aug. 9, 2006) ("[E]vidence of a disability decision by another governmental or nongovernmental agency cannot be ignored and must be considered."). A VA disability determination is entitled to "great weight" in most cases, but "the relative weight to be given to the determination varies depending upon the factual circumstances of each case." *Chambliss*, 269 F.3d at 522. "ALJs need not give 'great weight' to a VA disability determination if they adequately explain the valid reasons for not doing so." *Id.*; *see also Albo v. Colvin*, No. 2:12-CV-0066, 2013 WL 5526584, at *8 (N.D. Tex. Sept. 30, 2013) (an ALJ's "decision must show meaningful consideration of the VA disability determination and provide specific reasons for giving the determination diminished weight.") (citing *Chambliss*, 269 F.3d at 523). "Although there is no bright-line rule . . . setting forth what level of explanation or discussion of valid reasons is necessary to be considered adequate, some level of discussion and/or scrutiny of the VA disability determination is required." *Harris-Nutall v. Colvin*, No. 3:15-CV-3334-D, 2016 WL 3906083, at *7 (N.D. Tex. July 19, 2016) (quoting *Albo*, 2013 WL 5526584, at *8). "If the ALJ fails to consider the disability rating and explain her reasons for discounting it, she has failed to apply the proper legal standard and committed reversible error." *Rasco v. Berryhill*, No. 4:17-CV-946, 2018 WL 587948, at *4 (S.D. Tex. Jan. 5, 2018) (citing cases).

Here, the ALJ acknowledged that Plaintiff was awarded "a combined 100% service-connected disability rating" from the VA, and stated that she "considered the [VA's] disability ratings and the medical evidence upon which the ratings were premised." (doc. 12-1 at 39.) The ALJ did not state that any weight was given to the VA's disability rating, however, and after

16

explaining that "a decision by another governmental agency about whether the claimant is 'disabled' is based on its rules and is not binding on the Commissioner of Social Security," concluded that she "based [her] decision on Social Security law and regulations." (*Id.*)

The Commissioner argues that the ALJ provided a valid explanation for not giving the VA rating great weight by noting that the VA's disability determination is not binding on the Commissioner. (doc. 18 at 6-7.) "However, district courts in the Fifth Circuit have found that this '*is not a valid basis to reject a VA disability rating.*'" *Rasco*, 2018 WL 587948, at *4 (emphasis in original) (quoting *Johnson v. Colvin*, No. 15-CV-0189, 2016 WL 3982569, at *4 (W.D. Tex. July 20, 2016); *Schenkler v. Colvin*, No. 3:14-CV-3214, 2015 WL 5611497, at *4 (N.D. Tex. Aug. 11, 2015), *adopted by*, 2015 WL 5611193 (N.D. Tex. Sept. 23, 2015)); *see also Allison v. Berryhill*, No. 1:16-CV-0170-BL, 2018 WL 1274853, at *6 (N.D. Tex. Feb. 16, 2018) (recognizing that although a "VA disability rating is not binding in the social security context," "that fact does not permit an ALJ to simply disregard VA findings without comment or discussion."). Rather, ALJs must provide "specific reasons" for not giving "great weight" to VA disability determinations. *Chambliss*, 269 F.3d at 522–23. Accordingly, the ALJ could not disregard the VA's disability rating simply because VA disability determinations are not binding on the Commissioner. *See Allison*, 2018 WL 1274853, at *6.[2]

The Commissioner also appears to argue that the ALJ properly considered the VA's disability rating because the ALJ "specifically asked about the VA rating at the administrative

---

[2] The Commissioner also relies on *Garrett v. Astrue*, No. 4:11-CV-066-Y, 2011 WL 6938463, at *11 (N.D. Tex. Oct. 18, 2011) in support of its argument that the ALJ complied with her duty to consider the VA rating and explain her reasons for not giving it great weight. (doc. 18 at 7.) *Garrett* is distinguishable, however, because the ALJ in that case specifically discounted the VA's disability rating not only because the VA's disability determinations were based on different rules than those utilized by the Commissioner, but also because "[t]heir determinations [could] involve a different body of facts given the claimant's date last insured . . . ." 2011 WL 6938463, at *10.

hearing . . . and then discussed it in her decision . . . ." (doc. 18 at 6.) Although the ALJ asked Plaintiff what his VA disability rating was, she did so only in passing and did not ask any other questions regarding the disability rating. (doc. 12-1 at 56-57.) Further, as discussed above, while the ALJ acknowledged the rating in her decision, she appears to have concluded that the rating was not entitled to great weight only because the VA's disability findings were not binding on the SSA. *See Allison*, 2018 WL 1274853, at *6; *Rasco*, 2018 WL 587948, at *4. There was also no indication that the rating was scrutinized or given any meaningful consideration by the ALJ in her decision. *See McCown v. Astrue*, No. G-06-745, 2008 WL 706704, at *17 (S.D. Tex. Mar. 14, 2008); *see also Chambliss*, 269 F.3d at 522–23. While the ALJ was clearly aware of the VA's disability rating, "such awareness can hardly be said to constitute a thorough and well-reasoned consideration of the VA's disability rating" as required under Fifth Circuit precedent. *Allison*, 2018 WL 1274853, at *7 (citing *Clark v. Colvin*, No. 13-0111, 2014 WL 122020, at *5 (E.D. La. Jan. 13, 2014)).

Additionally, although the ALJ stated that she considered "the medical evidence upon which the [disability] ratings were premised," the record shows that the VA's disability rating was only a two-page document that provided no explanation for the disability finding. (docs. 12-1 at 39; 12-2 at 302–03.) The ALJ therefore "could not conduct any meaningful analysis of whether the VA disability rating should or should not be given any weight when [she] did not have the basis of the disability determination before [her]." *Albo*, 2013 WL 5526584, at *8. Even if the ALJ were able to consider the medical evidence upon which the VA's disability rating was based, courts in this circuit have recognized that the ALJ must do more by actually weighing and considering the VA rating itself. *Rasco*, 2018 WL 587948, at *4 (quoting *Clark*, 2014 WL 122020, at *6); *see also Bragg v. Astrue*, No. H-11-CV-3826, 2012 WL 4356847, at *10 (S.D. Tex. Sept. 4, 2012) (finding error where the ALJ considered VA treatment records but failed to discuss disability ratings),

18

*adopted by*, 2012 WL 4356844 (S.D. Tex. Sept. 21, 2012). Accordingly, while the ALJ acknowledged the VA's disability rating, she "did not [and could not] review, consider, and analyze the specific evidence used by the VA to reach the disability determination." *Id*.

Because the ALJ only acknowledged the VA's disability rating, but failed to give it any meaningful consideration or to provide any specific reasons for declining to give it any weight, she committed legal error. *See Schenkler*, 2015 WL 5611497, at *4 (determining that the ALJ erred where he only considered the VA's disability determination but did "not make any subsequent references to the disability determination."); *Albo*, 2013 WL 5526584, at *8 (finding that the ALJ committed legal error in failing to properly consider the VA's rating of total disability); *J.W.M. v. U.S. Comm'r Soc. Sec. Admin.*, 2009 WL 3645105 at *2 (W.D.La. Oct.30, 2009) (finding error where the ALJ mentioned the disability rating and noted that it was not binding, but failed to discuss the disability determination); *McCown*, 2008 WL 706704, at *17 (finding legal error where the ALJ only acknowledged the VA rating in his decision and stated that the rating was not binding and was inconsistent with objective medical record).

As noted, an ALJ fails to apply the proper legal standard when she fails to consider a VA disability rating and explain her reasons for discounting it. *Rasco*, 2018 WL 587948, at *4; *see Albo*, 2013 WL 5526584, at *7 ("The failure to follow this rule is legal error requiring reversal."); *Moody v. Astrue*, No. 2:10-CV-0230, 2012 WL 1019590, at *4 (N.D. Tex. Mar. 9, 2012) (same), *adopted by*, 2012 WL 1030349 (N.D. Tex. Mar. 27, 2012). Generally, appeals from administrative agencies of a procedural error will not lead to a vacated judgment "unless the substantial rights of a party have been affected." *Anderson v. Sullivan*, 887 F.2d 630, 634 (5th Cir. 1989) (per curiam) (quoting *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988) (per curiam)). However, a failure to apply the correct legal standard is a legal error, not a procedural error. The Fifth Circuit has left the

lower courts no discretion to determine whether this type of an error was harmless. It has mandated that when the Commissioner "has relied on erroneous legal standards in assessing the evidence, he must reconsider that denial." *Moore v. Sullivan*, 895 F.2d 1065, 1070 (5th Cir. 1990) (quoting *Leidler v. Sullivan*, 885 F.2d 291, 294 (5th Cir. 1989)). In light of the ALJ's legal error, this case should be remanded with directions to the ALJ to apply the correct legal standard. *See Ayala v. Berryhill*, No. 4:17-CV-00783-O-BP, 2018 WL 1470626, at *5 (N.D. Tex. Mar. 8, 2018) ("Harmless error analysis does not apply to an ALJ's failure to consider and weigh the VA's disability rating."), *adopted by*, 2018 WL 1457246 (N.D. Tex. Mar. 23, 2018); *Rasco*, 2018 WL 587948, at *4 ("'the failure of the ALJ to consider the VA's disability determination is the type of legal error that is not subject to the harmless error analysis as the Court cannot try issues de novo, reweigh the evidence, nor substitute its findings for those of the Commissioner.'" (citations omitted)).

### III. CONCLUSION

The Commissioner's decision is **REVERSED**, and the case is **REMANDED** to the Commissioner for further proceedings.

**SO ORDERED**, on this 22nd day of March, 2019.

_____
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE